UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

| | |
|---|---|
| In re<br><br>NOUHAD B. BECHARA and<br>MONA M. BECHARA,<br><br>　　　　　　　　　Debtors<br><br>DONALD R. LASSMAN, as<br>　CHAPTER 7 TRUSTEE and<br>　as Assignee of ANDALUS VARIETY<br>　MART, INC.,<br><br>　　　　　　　　　Plaintiff<br><br>v.<br><br>ROBERT DeVOE, Individually<br>　and as Trustee of the<br>　R&M REALTY TRUST,<br><br>　　　　　　　　　Defendant | Chapter 7<br>Case No. 18-13601-FJB<br><br><br><br><br>Adversary Proceeding<br>No. 18-1192 |

**MEMORANDUM OF DECISION**

**I.**　**Introduction**

By the remaining counts in his complaint in this adversary proceeding, the chapter 7 trustee seeks to liquidate prepetition claims of the debtors and their wholly-owned corporation against their commercial landlord for tortious interference with advantageous relations and violation of Mass. Gen. Laws ch. 93A (unfair or deceptive acts or practices in commerce).  After a trial, the Court now enters this memorandum of decision, including the Court's findings of fact and conclusions of law. For the reasons stated herein, the remaining counts will be dismissed.

II.     **Procedural History**

On September 25, 2018, Nouhad and Mona Bechara (together, "the Becharas" or "the Debtors") filed a joint petition for relief under chapter 7 of the Bankruptcy Code. In the case thereby commenced, Donald Lassman ("the Plaintiff") was appointed and remains the chapter 7 trustee.  In that capacity, he filed the complaint herein to liquidate causes of action that belonged to the Debtors when they filed their bankruptcy petition.  The defendant is Robert DeVoe ("DeVoe"), both as trustee of the R&M Realty Trust ("the Trust") and individually. The Trust is the owner of real property out of which the Debtors, through their wholly-owned corporation, Andalus Variety Mart, Inc.  ("Andalus"), operated a convenience store under a commercial lease between the Trust as lessor and the Debtors and Andalus as lessees.

DeVoe was initially defaulted for failure to answer, but the default was vacated by agreement. DeVoe then moved to dismiss the complaint for failure to join Andalus, which he contended was a necessary party.  The motion to dismiss was rendered moot when the Plaintiff then filed an amended complaint in which he asserted that any and all claims of Andalus against DeVoe had been assigned to the Plaintiff.  DeVoe then answered the complaint, denying the salient allegations and asserting affirmative defenses, including one for setoff.  In their Joint Discovery Conference Certification and Report, the parties jointly consented to the entry of a final order by this Court as to each matter in dispute.

The amended complaint states four counts.  At the beginning of the trial, the parties stipulated to the dismissal of Count I in its entirety and of Count II as to DeVoe in his individual capacity.  Upon a later motion by DeVoe as trustee for judgment on partial findings, which the Plaintiff did not oppose as to Count II, the Court dismissed Count II as to DeVoe as trustee. The counts remaining are Count III, for interference with advantageous relations, and Count IV, for treble damages and attorney's fees under MASS. GEN. LAWS ch. 93A, § 11 (unfair or deceptive acts or practices in commerce); each is asserted

against DeVoe both as trustee and in his individual capacity. The gravamen of both as pled in the amended complaint is the same: that DeVoe, for an improper purpose, placed unreasonable conditions on a request by the Becharas and Andalus for DeVoe, as trustee, to consent to assignment of their lease to a prospective purchaser of the convenience store and thus tortiously interfered with and defeated a prospective sale of their business.

In his response to the Defendants' motions for judgment on partial findings, the Plaintiff took the position that Counts III and IV, as tried with the implied consent of the Defendants, had a new and different gravamen: not that DeVoe had interfered with assignment of the existing lease—the parties agree that there was no evidence that the prospective purchaser, Boston Convenience, ever sought an assignment of the existing lease—but that he had interfered in the sale of the convenience store business by setting unreasonable conditions for entry into *a new lease* with the prospective purchaser of the business. After having the parties brief the issue, the Court ruled that Counts III and IV, as so amended, had been tried with the Defendants' implied consent and that, pursuant to Fed. R. Civ. P. 15(b)(2), these counts should be deemed amended to conform to the evidence, to reflect the new gravamen. See Memorandum of Decision on Motions for Judgment on Partial Findings, entered March 19, 2021 [doc. #80]. At the same time, the Court also denied a further request by the Plaintiff to deem the amended complaint further amended to include a count for unjust enrichment. The Court also denied motions for judgment on partial findings as to Count III and IV, directed the parties to file proposed findings of fact and conclusions of law, and heard closing arguments.

**III.     Jurisdiction**

This adversary proceeding relates to a case under title 11, the Bankruptcy Code, and therefore falls within the bankruptcy jurisdiction given to the district courts in 28 U.S.C. § 1334(b) (giving district courts original but not exclusive jurisdiction of all civil proceedings related to cases under title 11). By the District Court's standing order of reference, the matter is referred to the bankruptcy court for this

3

district pursuant to 28 U.S.C. § 157(a). *See* L.R. 201, D. Mass. The counts in this adversary proceeding, having arisen before the commencement of this bankruptcy case and entirely under state law, are not core proceedings. The parties have consented to this court's entry of final judgment. By virtue of that consent and pursuant to 28 U.S.C. § 157(c)(2), this court may enter final judgment in this adversary proceeding.

**IV.    Findings of Fact**

1. At all times relevant to this adversary proceeding, the real property at 1036 Turnpike Street, Canton, Massachusetts ("the Property") has been owned by the Trust, and DeVoe has been the trustee of the Trust.

2. Beginning in March 2011, the Becharas operated a convenience store at the Property. The Becharas incorporated their convenience store and operated it through the corporation, Andalus Variety Mart, Inc. ("Andalus"), of which, at all relevant times, they were the sole owners.

3. Andalus occupied and operated out of the Property under a commercial lease (the "Lease"). The Lease was entered into on March 11, 2014 by the Trust as lessor and Andalus and the Becharas (Andalus and the Becharas together, "the Lessees") as joint lessees.

4. The Lease had a term of five years, extending through March 10, 2019. It included an option to renew for an additional five years, but paragraph 31 of the Lease provided that that option was exercisable "so long as Lessee has not been in default under the terms of the Lease." Lease, ¶ 31.

5. Rent under the Lease included two components: a base rent of $2,700 per month for the first five years and escalating thereafter; and "additional rent" consisting of 25 percent of the real estate taxes, insurance, and operating expenses for the building of which the leased premises were a part.

6. The Lease prohibited the Lessees from assigning the lease or subletting the premises without the lessor's consent, but it further provided the lessor's consent "shall not be unreasonably withheld[.]" Lease ¶ 14.

7. Around the time the parties entered into the Lease, the City of Canton granted Mona Bechara a license for sale of beer and wine from the leased premises (the "Beer and Wine License"). Under this license, Andalus sold beer and wine. Its ability to do so was crucial to the viability of its business.

8. The Lease did not restrict or place conditions on the transfer of the Beer and Wine License, either by the Lessees or by anyone to whom they might assign the lease or sell their business.

9. The Becharas had purchased the convenience store with the expectation that, for the most part, it would be staffed and run by their family, but things did not turn out that way. Instead, they had to rely more extensively than expected on hired help, which increased expenses. By 2017 they were operating at a loss, were behind on the base rent, and had never paid any additional rent. They resolved to sell the business and, in 2016, had begun looking for a purchaser.

10. In February 2017, the Becharas received their first serious offer, from a buyer identified only as Mejer ("Buyer One"). Buyer One owned and operated other convenience stores. He was offering $100,000 (for precisely what is not clear). The offer was contingent on the offeror's obtaining a satisfactory lease arrangement with the Trust lessor. Buyer One was apparently content to take an assignment of the remainder of the existing lease, but, if this was possible at all (as the lease was then in default), it at least required the consent of the lessor. The Becharas' attorney, Paul Conley, viewed the settling of the lease as the first step in negotiating a purchase and sale of the business because, without a lease acceptable to the prospective purchaser, there would be no sale to negotiate.

11. Conley therefore contacted DeVoe, as trustee of the landlord Trust, to inform him of this prospective purchaser and to determine the terms on which he might be willing to lease to this

5

purchaser. When they met—it is unclear when this occurred—DeVoe indicated that any new lease he entered into as to the premises would include provisions designed to prevent the new lessee from moving a beer and wine license acquired for the premises to a new location. He explained that he viewed the beer and wine license as an important part of the value of the Trust's real estate.

12. Conley then relayed this information to George Matta, the attorney for Buyer One, who, as Conley put it, "categorically objected" to DeVoe's idea—the idea had not yet been translated into actual contract terms—and expressed that it was unacceptable. However, before he could discuss this development with his client, and, as Conley put it, before the discussion between himself and Matta reached any kind of conclusion, the Becharas received a second, richer offer, which caused them to lose interest in Buyer One.

13. The second offer was made by one Baram Singh, on behalf of an enterprise known as Boston Convenience Enterprises, Inc. ("Boston Convenience"). Boston Convenience operated several convenience stores in the Boston area.

14. Boston Convenience gave the Becharas a letter of intent, dated June 28, 2017 (the "Letter of Intent") and a $10,000 deposit by check dated April 14, 2017.[1] The Letter of Intent was in essence an expression of intention to enter into a purchase and sale agreement with Andalus for purchase of the assets of Andalus for cash of $125,000 plus assumption of certain liabilities. It included five material contingencies: (i) that the seller's landlord enter into a new lease with the purchaser on the same terms and conditions as the seller's lease with the lessor; (ii) that the lessor agree to permit the purchaser to park and sell from its food truck on a portion of the leased premises; (iii) that the purchaser obtain a Retail Alcoholic Beverage License from the Alcoholic Beverage Control Commission and the town of Canton for the premises; (iv) that the purchaser be permitted to conduct its due diligence; and (v) that the purchase price is "subject to further investigation and analysis." The Letter of

---

[1] The discrepancy between the two dates is unexplained but also immaterial.

6

Intent further stated that it was an expression of intention only and not a binding commitment on the part of either party. When it was entered into, Boston Convenience had not conducted its due diligence. The Letter of Intent was signed by Paramjit Singh as the purchaser and Nouhad Bechara for Andalus; the dates of signature are not in evidence.   It was not signed by Mona Bechara in any capacity.

15.    Conley learned of Boston Convenience and its offer only after the Letter of Intent was received and signed.  He then promptly, and without first contacting DeVoe, contacted Boston Convenience and informed them of DeVoe's position on restricting transfer of the beer and wine license.  Boston Convenience nonetheless agreed to meet with DeVoe, and Conley set up a meeting between DeVoe and a representative of Boston Convenience to work out the terms of a new lease. Conley intended to attend only to make the introduction, but not to stay for the meeting. The meeting was scheduled to take place on Monday, July 31, 2017.  In the course of setting up the meeting, Conley learned from DeVoe that he had not changed his mind about insisting on a restriction on transfer of the new tenant's beer and wine license.

16.    Conley and a Mr. Kumar, for Boston Convenience, met at DeVoe's office at the appointed hour, but, after waiting some time, were told by office staff that DeVoe wasn't there and that they didn't know when he'd be back. Mr. Kumar was unhappy, said "this is not to my liking," and, at that point, lost interest in the deal.  DeVoe had simply forgotten about the meeting and, when Conley later contacted him, apologized for that. Conley contacted Kumar to relay this information, but Kumar and Boston Convenience had lost interest.

17.    Conley attempted to revive the deal by talking to an attorney who had previously represented Boston Convenience but whom Boston Convenience had not retained in conjunction with this matter.  These efforts went nowhere; it is not clear that this attorney even communicated with Boston Convenience about Conley's overtures.

18. During this time, DeVoe's intent—in restricting transfer of a tenant's beer and wine license to a new location—had been to protect the value of his property. He understood that the value of the unit occupied by Andalus, which was at least the third occupant to operate a convenience store at that location, was enhanced by the availability of a beer and wine license to anyone trying to operate a convenience store there. DeVoe apparently believed that the holder of a beer and wine license was free to move it at will within the town.

19. DeVoe's intent was not to quash the sale by Andalus to Boston Convenience. He favored a sale of the convenience store as a going concern and very much wanted one to occur, because he wanted (i) a rent-paying tenant going forward and (ii) for Andalus to receive sale proceeds from which it could pay him the considerable and growing rent owed under the Lease. It is for this reason that he did not evict the Becharas and Andalus when they first fell behind on the rent and then, for well over a year, as the arrears continued to grow.

20. Nor was DeVoe motivated by an intent to take back the premises so that he could operate a convenience store there himself. He showed an interest in doing so when he first learned that the Becharas were planning to sell, but he quickly lost interest in this plan. Much later, when no sale remained in prospect and the lease had by agreement been terminated, he did take back the premises and open a convenience store of his own. But during the time of Boston Convenience's interest in the premises, DeVoe was fully supportive of a sale to a new tenant.

21. DeVoe appears not to have believed, when he first announced to Conley his intention to restrict the transfer of a lessee's beer and wine license, that the restriction he contemplated would be a deal breaker for prospective purchasers. Later Conley did try to convince him otherwise, but I have no

evidence as to whether Conley succeeded in making DeVoe understand that his restriction was a deal breaker.[2]

22.     The Plaintiff has not proven by a preponderance of the evidence that the restriction that DeVoe contemplated was in fact a deal breaker for either Buyer One or Boston Convenience.

23.     Attorney Matta, for the Buyer One, expressed disapproval of DeVoe's restriction, but the reaction (if any) of Buyer One is not in evidence; and the record does not indicate whether, and if so why, Matta would have counseled his client against accepting the term, if the alternative was to walk away from an otherwise desirable agreement. Neither Matta nor any representative of Buyer One was called as a witness.

24.     No representative of Boston Convenience was called to testify, so the Court has no first-hand testimony as to why Boston Convenience lost interest. Conley testified that either Kumar or Singh—he could not remember which—had told him that he would sign "the lease" (the lease in question is not identified) without changing a word if the conditions regarding transfer of the beer and wine license were removed; it is not clear when this allegedly was said. I do not credit this testimony. It was admitted into evidence but is nonetheless rank hearsay—and the record is unclear even as to who said it.

25.     DeVoe never did meet with a representative of Boston Convenience. He never had a chance to assess Boston Convenience's reaction to his concerns and the terms he might insist on, or to adjust his stance as he saw fit in response. The only person who ever communicated with Kumar or Singh about DeVoe's restrictive concerns was Conley, who did so without first consulting with DeVoe and not as DeVoe's agent.

---

[2] To be clear, I am not here finding that it was a deal breaker, only that I do not know whether Conley brought DeVoe around to that understanding.

26.     In addition, DeVoe never had a chance to appraise Boston Convenience as a potential tenant from any of a number of angles.  It is speculative to conclude that, had he not had this concern to restrict transfer of a tenant's beer and wine license, DeVoe as Trustee would surely have entered into a lease with Boston Convenience.

27.     There are other reasons—other than DeVoe's desire to restrict transfer by a tenant of its license—that Boston Convenience might have lost interest.  First, Boston Convenience wanted the lessor to permit it to park and sell from its food truck on a portion of the leased premises, but DeVoe was unwilling to permit this. There is no testimony that Boston Convenience had dropped its insistence on this term.  Second, DeVoe had not appeared for the scheduled meeting with Kumar to discuss the terms of a new lease. This by itself appears to have displeased Kumar, who may have taken it as rudeness or a slight or simply as reason to conclude that DeVoe was not someone he [Kumar] wanted to do business with.  This certainly was the event that immediately preceded Boston Convenience's walking away from the prospective purchase.  DeVoe's restriction, on the other hand, had not triggered this reaction; when Conley had first informed Boston Convenience of DeVoe's intent to restrict transfer of the beer and wine license, Boston Convenience had not walked away but rather had agreed to a meeting with DeVoe.  Third, at the time of its interest in Andalus, Boston Convenience was in the process of acquiring or opening multiple convenience stores in a hurry.  It is possible that it satisfied its objectives by acquiring other stores, and that the marginal value of acquiring this one too was simply too little and too late.  Lacking first hand testimony, none of these possibilities can be ruled out.

28.     In addition, there was little evidence as to why DeVoe's restriction should have mattered at all to a prospective purchaser.  Such evidence as was adduced about beer and wine licenses in Canton indicated that they were specific as to both the person licensed to sell and the location at which they were so licensed. If that is the case, the holder of a license could not have carried it to a new location, much less transferred it to a transferee at a new location.  In other words, it appears that the

10

licensing laws already (effectively) prohibited what DeVoe was seeking to prohibit, and that his restriction on transfer was therefore of no significance. The Plaintiff bore the burden of proving that DeVoe's restriction was somehow meaningful, would make a difference to a prospective purchaser, but he submitted no evidence in that vein about the licensing rules or about the legal considerations of potential purchasers. It may be that prospective purchasers were motivated by false understandings of the law, but I have no evidence that that was the case.

29. After Boston Convenience walked away and DeVoe hired Attorney Robert Burr as his counsel, Burr generated and sent to Conley a lease containing two terms that implemented the restriction DeVoe wanted: a liquidated damages clause, requiring the prospective buyer to pay $150,000 in the event it sold the license without consent; and a right of first refusal for the lessor to purchase the license. Neither of these specific terms could have caused Boston Convenience to walk away from the deal because neither was generated until after Boston Convenience had walked away. This lease did not permit a prospective lessee to park a food truck on the premises.

30. Later, in November 2017, DeVoe changed his mind and agreed to make available to prospective purchasers a lease that did not include a restriction on transfer of the beer and wine license. This lease, too, did not permit a prospective lessee to park a food truck on the premises.

31. Throughout 2017 and the early months of 2018, the Becharas and Andalus continued falling further behind on rent payments, and business continued to deteriorate.

32. In December 2017, when the lessees again failed to pay the month's base rent—they had still never once paid the additional rent—DeVoe believed he was being taken advantage of and sent the lessees a notice to quit. He wanted to commence summary process proceedings to evict Andalus. Conley urged him to hold off on the summary process, saying that if they received an offer they would be bound to disclose the pendency of this litigation, which would have a chilling effect on a potential offer. DeVoe relented.

11

33. In February 2018, the Becharas received a third expression of interest. This prompted Conley to contact Burr to clarify that, if a sale to this purchaser could be consummated, DeVoe would be willing to accept $50,000 from the proceeds in full satisfaction of all amounts due under the lease, despite the fact that the lease arrears at that point exceeded $50,000. Burr did so confirm DeVoe's willingness. DeVoe's willingness to cap the debt would enable the sale to be made; otherwise, the lessees' might be unable to satisfy their business-related obligations and liens from the proceeds, a condition of any prospective purchase.

34. Around February 7, 2018, for reasons not in evidence, the third offeror did not follow through and walked away. Thereafter, the Becharas received no further offers.

35. In May 2018, DeVoe finally did commence an action for possession.

36. On May 30, 2018, the Becharas and Andalus entered into an agreement with DeVoe to terminate the lease, turnover possession to him, and quantify the debt owing. Pursuant to this agreement, a judgment for possession and damages in the amount of $75,383.56 against the Becharas and Andalus entered on May 31, 2018.

37. In the May 30, 2018 agreement with DeVoe, Mona Bechara agreed to surrender her beer and wine license for the premises to the town of Canton. DeVoe's purpose in arranging for this surrender was to make a license available to himself (upon application to the town) for use on the premises in a convenience store that he intended to open there himself when the Becharas vacated.

38. Mona Bechara did in fact surrender her license as agreed; and DeVoe did in fact obtain a beer and wine license following the surrender by Mona Bechara of her license. DeVoe uses his new license in a convenience store that he now operates from the premises.

39. On September 25, 2018, the Becharas filed their bankruptcy petition.

40. Any and all claims that Andalus has against the defendants have been assigned to the Plaintiff.

V.    **Arguments of the Parties**

The Plaintiff alleges the beer and wine license restrictions, especially the liquidated damages clause, prevented sale of the premises, constituting tortious interference with business relations. The Plaintiff reasons that charging $150,000 in liquidated damages exceeded any price the convenience store could sell for, providing a nonstarter to any prospective buyer. More importantly, it constituted an attempt to exercise control over an asset, the license, that belonged to Mona Bechara and that he had no right to control.  The Plaintiff concedes that DeVoe later removed the liquidated damages clause but maintains that this occurred only because he realized the provisions were wrongful. And the reversal occurred too late, when the convenience store was no longer marketable as a going concern.

DeVoe disagrees, maintaining that the proposed amount provided in the liquidated damages clause was not only permissible, but necessary to protect the value of the Trust's premises. The Defendants reason that the convenience store could not survive without the beer and wine license. Consequently, DeVoe, as trustee of the trust that owned the premises, had a right, and duty to the Trust, to protect this value when proposing a new lease. DeVoe further insists that prospective purchasers could have initiated negotiations to decrease the amount of liquidated damages. But this never occurred. In fact, none of the prospective purchasers even contacted him to conduct due diligence. Nor did any prospective purchasers indicate they were ready and able to enter into a formal agreement to purchase the premises.

VI.    **Analysis**

A.    **Count III: Intentional Interference with Advantageous Business Relationship**

In Count III the Plaintiff seeks damages against DeVoe, both as trustee and in his individual capacity, for intentional interference with an advantageous relationship between Andalus and Boston Convenience, Andalus's prospective purchase and sale of Andalus's assets to Boston Convenience.[3]  The

---

[3] The Plaintiff seeks no such relief with respect to the prospective sale to Buyer One.

tort of intentional interference with advantageous contractual relations protects a plaintiff's economic interests from wrongful interference. *See ADH Collision of Bos., Inc. v. Wynn Resorts, Ltd.*, 2020 WL 3643509, at *2 (D. Mass. July 6, 2020); *Blackstone v. Cashman*, 448 Mass. 255, 259 (2007). A successful claim for tortious interference requires proof that (1) the plaintiff had an advantageous relationship with a third-party, such as a present or prospective contract; (2) the defendant knowingly induced a breaking of the relationship; (3) the defendant's interference with the relationship, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant's actions. *See ADH Collision of Bos., Inc.,* 2020 WL 3643509, at *2; *Blackstone*, 448 Mass. at 260; *Kurker v. Hill*, 44 Mass. App. Ct. 184, 191 (1998); *G.S. Enters., Inc. v. Falmouth Marine, Inc.*, 410 Mass. 262, 272 (1991).[4]

   i.   *Existence of Advantageous Relationship with a Third Party*

The first requirement is proof that the plaintiff had an advantageous relationship with a third party. The Plaintiff is a trustee in bankruptcy. He is not complaining of a tort committed against him but of torts against the Debtors, whose prepetition causes of action he now controls by operation of 11 U.S.C. § 541(a)(1) (the bankruptcy estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case"), and against Andalus, whose prepetition causes of action he now controls under 11 U.S.C. § 541(a)(7) (the bankruptcy estate includes "any interest in property that the estate acquires after the commencement of the case") because they have been transferred to him. In essence, then, the Plaintiff is advancing three causes of action against DeVoe, one for each debtor and another for Andalus. The Plaintiff stands in the shoes of those whose claims he is now seeking to liquidate, and the Court must evaluate the claim of each debtor and Andalus separately.

---

[4] As the events in question transpired entirely in Massachusetts, Massachusetts is the state whose law governs these counts. Neither party contends otherwise.

The advantageous relationship that forms the basis of this count is the prospective purchase and sale agreement that was the subject of Boston Convenience's Letter of Intent. It outlined and contemplated a sale of the assets of Andalus to Boston Convenience. It did not contemplate a purchase of the liquor license, which was held by Mona Bechara; rather it contemplated that Boston Convenience would obtain its own beer and wine license. The parties to the Letter of Intent were Andalus and Boston Convenience. Nouhad Bechara signed it on behalf of Andalus only, not individually, and Mona Bechara did not sign it at all. Neither Nouhad nor Mona was a party to the agreement embodied in the Letter of intent or of the purchase and sale agreement that it contemplated. The Plaintiff has not explained how the advantageous relationship embodied and envisioned in the Letter of Intent can have constituted a relationship to which either Nouhad or Mona was a party. I therefore conclude that this first requirement is satisfied as to Andalus but not as to Nouhad or Mona. For this reason, judgment must enter on Count III for DeVoe as to the claims of both Nouhad and Mona.

    ii. *Knowingly Induced a Breaking of the Relationship*

The second requirement is proof that the defendant's breaking of the advantageous relationship was knowingly induced. This is a requirement of intent. "The interference with the other's prospective contractual relation is intentional if the actor desires to bring it about or if he knows that the interference is certain or substantially certain to occur as a result of his action." Restatement (Second) of Torts § 766B, comment d (1979). I have found that DeVoe did not intend or desire to prevent, break up, or otherwise interfere with the prospective purchase and sale between Andalus and Boston Convenience. He had every reason to see it come to fruition. I have further found that the Plaintiff has not proven by a preponderance of the evidence that DeVoe knew that his insistence on terms preventing the new lessee from moving a beer and wine license acquired for the premises to a new location was certain or substantially certain to cause Boston Convenience to lose interest in acquiring

15

Andalus's assets. Count III therefore also fails, now as to Andalus as well, for failure to establish that DeVoe's inducement of the break-up was knowing.

    iii. *Improper in Motive or Means*

The third requirement is that the alleged interference must have involved an improper motive (such as wishing to do injury) or improper means (such as deceit or economic coercion). *Horne v. City of Bos.*, 509 F. Supp. 2d 97, 116 (D. Mass. 2007). Here, there was no wish to spite or do injury but only a desire by DeVoe to protect the value of his rental property, a legitimate business purpose. Especially, as here, when the advantageous relationship in question was prospective and not an existing contract, "hard bargaining and lawful competition generally do not amount to impermissible interference under Massachusetts law." *Hamann v. Carpenter*, 937 F.3d 86, 90–91 (1st Cir. 2019). Improper motive does not exist "[w]hen a defendant's purpose is the legitimate advancement of its own economic interest." *Pembroke Country Club, Inc. v. Regency Sav. Bank*, F.S.B., 62 Mass. App. Ct. 34, 38 (2004). I therefore conclude that nothing about DeVoe's motive was improper.

The Plaintiff argues that the means were improper because DeVoe was attempting to wrest control from the Debtors and Andalus of their—in fact, Mona's—beer and wine license. The facts do not support this. The prospective purchase and sale agreement with Boston Convenience involved no sale of Mona's license; rather, it contemplated that Boston Convenience would obtain a beer and wine license of its own. DeVoe's insistence on a prohibition on transfer would have prohibited Boston Convenience from transferring its own license—a license it did not yet have and had not even applied for—not Mona's.

There is a further reason the means were not improper. The advantageous relationship between Andalus and Boston Convenience required the cooperation of DeVoe as a third, independent party, not merely for DeVoe to refrain from interfering in an otherwise complete relationship. It required a new lease between Boston Convenience and the Trust. DeVoe, as trustee, was free to enter

16

into a new lease or not as he saw fit and on such terms as he saw fit. The restriction that in the first instance he was inclined to require of a new tenant, if unorthodox and off-putting to at least some potential tenants, was nonetheless a condition he was free to attach to the lease.  He owed no duty to Andalus or the Becharas to offer the prospective purchasers of their assets a deal with which he was not comfortable, to make their sale happen.  This was not a lease-assignment situation, in which he was bound by an existing lease and required not to withhold consent to assignment unreasonably. Massachusetts law would not in these circumstances find improper means.

    iv.  *Plaintiff Harmed by Defendant's Actions*

The fourth requirement is that the plaintiff must have been harmed by the defendant's actions. This is a requirement of causation.  I have found that the Plaintiff has not proven by a preponderance of the evidence, the applicable standard, that DeVoe's desire to restrict transfer of the beer and wine license was in fact the cause of Boston Convenience's walking away from a potential purchase of the assets of Andalus.

Having found that the Plaintiff has failed to carry its burden as to each of the four requirements, I conclude that judgment must enter for DeVoe, both as trustee and individually, on Count III, as to the claims of both debtors and Andalus.

    **B.**    **Count IV: Violation of Massachusetts General Laws Chapter 93A**

The Plaintiff's Chapter 93A claim is wholly derivative of his tortious interference claim.  Having found that the evidence failed to establish improper motive, improper means, causation, or knowing inducement of the break-up, the evidence is likewise insufficient to establish an unfair method of competition or an unfair or deceptive act or practice within the meaning of Chapter 93A. See *Pembroke Country Club, Inc. v. Regency Sav. Bank, F.S.B.,* 62 Mass. App. Ct. 34, 41, 815 N.E.2d 241, 247 (2004). *See* also *FAMM Steel, Inc. v. Sovereign Bank*, 571 F.3d 93, 107-108 (1st Cir. 2009).

**VII.     Conclusion**

For the reasons set forth above, judgment shall enter for DeVoe in both capacities on all counts.

Date:  February 22, 2022

_____
Frank J. Bailey
United States Bankruptcy Judge